GEORGE C. PRATT, District Judge.
 

 TABLE OF CONTENTS
 

 Page No.
 

 I. PRIOR PROCEEDINGS 1088
 

 II. EVIDENCE AT TRIAL 1090
 

 III. THE JURY’S VERDICTS 1091
 

 IV. DEFENDANTS’ ARGUMENTS 1093
 

 V. MOTION TO SUPPRESS TAPES 1093
 

 VI. INSUFFICIENCY OF EVIDENCE TO SUPPORT FEINBERG’S CONVICTION ON COUNT 5 1094
 

 VII. CLAIMED ENTRAPMENT 1094
 

 VIII. CLAIMED OUTRAGEOUSNESS 1097
 

 A. The “Coaching” Incident. 1097
 

 B. Timing of Interruptions. 1099
 

 C. Internal Governmental Memorandum. 1100
 

 D. Selective Prosecution. 1101
 

 E. Amount of Inducement. 1101
 

 F. Miscellaneous Instances of “Outrageous” Conduct. 1102
 

 G. Cumulative Effect. 1102
 

 IX. CLAIMED MISCONDUCT BY GOVERNMENT AT TRIAL 1102
 

 A. Rita Casino Evidence. 1103
 

 B. Biocel Evidence. 1103
 

 C. The Purpose for the Resale “Stall”. 1104
 

 D. Feinberg as "Bag Man”. 1105
 

 E. Summations. 1106
 

 X. CONCLUSION 1107
 

 POST-TRIAL MEMORANDUM AND ORDER
 

 Having been found by the jury to have been predisposed to commit the crimes of bribery, unlawful gratuity, conflict of interest, interstate travel, and conspiracy, defendants Williams and Feinberg now urge the court to set aside the jury’s verdicts and dismiss the indictment for due process and related reasons. After considering the arguments advanced and weighing all the evidence adduced in this and related cases, the court concludes that with one exception, the motions to dismiss, for judgment of acquittal, and for a new trial must all be denied. The one exception concerns defendant Feinberg’s motion for judgment of acquittal on count 5, discussed in section VI,
 
 infra.
 

 I. PRIOR PROCEEDINGS
 

 U. S. v. Williams et ah,
 
 CR 80-00575, was the fourth Abscam case tried before this
 
 *1083
 
 court. In contrast to the three previous cases, which were transferred from Judge Mishler in August, 1980, this case was directly assigned to the undersigned as a “related” case when the indictment was filed on October 30,1980. The case was originally set down for trial in February, 1981, but was later adjourned at defendants’ request.
 

 Extensive pretrial motions were filed, argued, and ruled upon. Defendants’ motions to have the case reassigned, to dismiss the indictment on speech and debate grounds, to hold a pretrial due process hearing, for a severance, to inspect portions of the grand jury transcripts, for dismissal of the indictment due to pretrial publicity, for a pretrial hearing on the admissibility of co-conspirator hearsay statements, for dismissal due to delay in presenting the case to the grand jury, for dismissal of portions of. the indictment on grounds of duplicity and multiplicity, to disqualify Thomas Puccio from prosecuting the case, to suppress all tape recordings involving Melvin Weinberg, to inspect all of the records of the jury clerk, for disclosure of income tax information relating to defendant Williams gathered by the government, and other requests were all denied. Numerous other motions seeking discovery, production of documents, a bill of particulars, and copies of videotapes, audio tapes, and transcripts were granted in part.
 

 Motions for severance by defendants Katz and Errichetti were granted. Decision on defendant Williams’ motion to dismiss on grounds of selective prosecution was reserved, and the motion was consolidated with defendants’ due process claims, decision on which was deferred until after the jury trial.
 
 [1]
 
 At least five pretrial appeals were taken to the Second Circuit, but this court’s denial of the motion to dismiss on speech and debate grounds was affirmed, and the other appeals were dismissed as untimely. All motions to stay the trial were denied either by this court or the Court of Appeals.
 

 Trial commenced on March 30, 1981, and continued until May 1, when the jury returned its verdicts of guilty on all counts against both defendants. A post-trial “due process” hearing was held on June 22 through June 25, 1981, for which additional discovery materials were sought and provided. The court approved a post-hearing briefing schedule that was protracted in order not to interfere unduly with defendant Williams’ efforts to meet charges pending in the United States Senate; that schedule was later extended further at defendants’ request. On October 21, 1981 the court heard oral argument by all sides.
 

 In addition to the records of the trial and post-trial hearings, the parties have had available to them for use on this “due process motion” the trial transcripts from the
 
 Myers,
 

 [2]
 

 Lederer,
 

 [3]
 

 and Thompson
 
 [4]
 
 cases, as well as the transcript from the consolidated post-trial hearing
 
 [5]
 
 held in those cases. Moreover, the court advised counsel that it would consider all of the arguments made by defendants in those three related Ab-scam cases, as well as any evidence from the Philadelphia and Washington Abscam
 
 *1084
 
 cases
 
 [6]
 
 that might be brought to the attention of the court through counsel.
 

 The specific post-hearing papers submitted on the instant motions include Williams’ memorandum and reply memorandum in support of the motion to dismiss on due process and related grounds; Williams’ brief and reply brief in support of motions for judgment of acquittal or a new trial; Feinberg’s memorandum in support of all post-trial motions; the government’s post-hearing memorandum in opposition to all motions; letters from Williams’ attorneys of record dated October 23, 1981 and November 14, 1981; and a letter from Feinberg’s attorney dated November 14, 1981. In addition, defendant Williams relies on two briefs filed pretrial relating to his claim of selective prosecution and suppression of tape recordings involving Weinberg.
 

 II. EVIDENCE AT TRIAL
 

 The general background of the “Abscam” investigation has previously been described by this court in its opinion denying the consolidated “due process” motions (hereinafter referred to as
 
 Myers
 
 decision), and need not be repeated.
 
 [7]
 
 Memorandum and order of July 24, 1981. In each of the three prior cases the trial focused upon a videotaped meeting at which a congressman was offered and accepted a cash bribe. In contrast, the charges in
 
 Williams
 
 covered a greater time span, and involved transactions that were more complex and subtle, than the earlier cases.
 

 Williams
 
 involved four defendants: (1) Harrison A. Williams, Jr., who is the only United States Senator to be indicted as a result of the Abscam investigation; (2) Alexander Feinberg, who was Williams’ attorney, and was claimed by the government to be his “bag man”; (3) George Katz, a New Jersey businessman who was alleged to have been a co-conspirator and participant in the business deal out of which the
 
 Williams
 
 charges arose; and (4) Angelo J. Errichetti, who was Mayor of Camden, New Jersey, and a New Jersey state senator.
 

 Errichetti’s trial was severed under a stipulation calling for dismissal in the event his conviction in the
 
 Myers
 
 case is affirmed. Katz’ trial was severed based on a doctor’s certification that he was too ill to stand trial.
 
 [8]
 
 Consequently, only Williams and Feinberg were tried by the jury.
 

 The charges focused upon a business transaction relating to a titanium mine in Virginia and processing plant in Georgia. Senator Williams’ investment group, consisting of himself, Feinberg, Katz, Errichetti and Sandy Williams,
 
 [9]
 
 sought financing to acquire the titanium enterprise. Through Errichetti the group contacted undercover agent Anthony Amoroso and Melvin Weinberg, who posed as members of Abdul Enterprises, an investment firm pretending to represent wealthy Arab sheiks.
 

 Attorney Feinberg organized three corporations to acquire ownership in and to operate the mining and processing venture, and the government’s evidence permitted the jury to find that Williams and Feinberg each held an 18% stock interest in each corporation. Gov’t ex. 19A. When the stock certificates were issued, blank certificates intended for defendant Williams’ benefit were delivered to him by Amoroso in a recorded meeting at Kennedy airport on August 5, 1979. Gov’t ex. 21A.
 

 Criminality arose out of the promise requested by the undercover agent as a condition for the financing, which was that defendant Williams would promise to use his power and influence as a United States
 
 *1085
 
 Senator to obtain government contracts for purchasing the titanium to be produced by the mine and processing plant. The government contended that defendant Williams agreed to do so in connection with two separate transactions: the stock-and-loan transaction, and the sale-of-stock transaction.
 

 In the stock-and-loan transaction, the government’s proof tended to establish that defendants organized corporations for the purchase and operation of the titanium mine and processing plant; that defendants each received an 18% stock interest in the corporations, with that of defendant Williams being hidden; that an agreement was reached between defendants and the government’s undercover operatives whereby $100 million in financing would be provided by the Arab sheik; and that defendant Williams agreed to use his position as a United States Senator to obtain government contracts for the titanium.
 

 In the sale-of-stock transaction the government’s evidence tended to show that even before the original loan transaction could be closed, a new group of Arab businessmen were willing to buy out the entire operation provided that Williams would retain a small interest and would, again, agree to use his influence as a United States Senator to obtain government contracts to purchase titanium.
 

 Williams met with the sheik and his representatives on seven different occasions. At the final meeting, January 15, 1980, the sheik offered Williams money in return for the senator’s assistance in permitting him to immigrate to the United States. Williams indicated that he was willing to assist the sheik, but he refused the money, explaining that his primary interest was in the mining venture.
 

 For each of the two transactions the government charged four specific crimes against the defendants: bribery (18 U.S.C. § 201(c)), criminal gratuity (18 U.S.C. § 201(g)), conflict of interest (18 U.S.C. § 203), and interstate travel for unlawful activity (18 U.S.C. § 1952). In addition, the defendants were charged with conspiracy (18 U.S.C. § 371) to defraud the United States and to commit the substantive offenses of bribery, criminal gratuity and conflict of interest. As the relevant public official, defendant Williams was charged with direct violations of the bribery, gratuity, conflict of interest, and interstate travel statutes. Defendant Feinberg was charged under 18 U.S.C. § 2 with aiding and abetting Williams’ commission of those offenses.
 

 The defendants presented evidence to show, and they argued to the jury that the titanium venture was a legitimate business transaction, that defendant Williams never agreed to use his influence to obtain government contracts, that neither defendant intended to violate any statute, that there was no conspiracy either to defraud the United States or to violate any of its laws, and that the defendants were the victims of entrapment.
 

 In addition to the audio tapes, the videotapes, and the testimony of the government agents, the government presented the testimony of Sandy Williams, who testified for the government under a grant of immunity, and a number of other witnesses. Defendants sharply attacked the credibility of Sandy Williams and of the government agents, and urged the jury not to draw from their testimony the inferences suggested by the government.
 

 Both defendant Williams and defendant Feinberg testified and offered explanations of their conduct as it had been recorded on the tapes. Through counsel and, in part, by their own testimony, Williams and Feinberg argued that they had been entrapped into committing whatever crimes had been committed.
 

 III. THE JURY’S VERDICTS
 

 The ultimate choice of inferences depended to a large degree upon the jury’s resolution of the credibility questions. From the verdicts it is apparent that the jury believed neither defendant Williams nor defendant Feinberg, and that it basically accepted the testimony of Sandy Williams as well as the government’s interpretation of
 
 *1086
 
 the tapes. Viewed in that light, the guilty verdicts on all but one count are amply supported by the evidence. Under the court’s instructions, with the one exception discussed in section VI,
 
 infra,
 
 the jury’s verdicts of guilty against all defendants on all counts established the essential elements of the crimes charged.
 

 On the bribery count that was based on the stock-and-loan transaction, 18 U.S.C. § 201(c), the jury found that defendant Williams received and agreed to receive stock in the titanium mine venture plus the promise of a loan from the sheik to finance the venture; that he received the stock and loan promise in return for being influenced in his performance of an official act, namely, to use his influence as a United States Senator with officials in the executive branch of the United States government and with other United States senators to obtain government contracts for the titanium mine; that when he sought the loan and received the stock defendant Williams intended to use the influence of his position to get government contracts; that defendant Williams acted knowingly, willfully, and corruptly; and that he was not the victim of entrapment because he was predisposed to commit the crime of bribery.
 

 Three key issues were highlighted for the jury: (1) What was Williams’ intent in accepting the stock and seeking the loan? (2) Did he act corruptly? and (3) Was he predisposed to commit the crime? On each of these issues the jury rejected Williams’ own testimony and, based on the circumstantial evidence before them, determined that each of the elements had been established beyond a reasonable doubt.
 

 On the criminal gratuity count, 18 U.S.C. § 201(g), the jury was asked to analyze the same facts from the point of view of the criminal gratuity statute. Many of the essential elements of criminal gratuity duplicated those of bribery. The significant difference was that the jury found that defendant Williams received, or agreed to receive, the stock for or because of an official act to be performed by him.
 

 On the conflict of interest charge, 18 U.S.C. § 203(a), the jury found that the loan and stock was compensation that Williams received or agreed to receive in return for services to be rendered by him in relation to obtaining contracts from the government for the purchase of titanium. The jury, of course, also found that in doing so he acted knowingly and willfully, and was not the victim of entrapment.
 

 On the interstate travel count, 18 U.S.C. § 1952, the jury found that on August 5, 1979 defendant Williams travelled from New Jersey to the Northwest Airlines terminal at John F. Kennedy International Airport in New York State; that he did so with the intent to carry on or promote the unlawful activity of receiving a bribe; that while he was at JFK airport he accepted delivery of the stock certificates; that he acted knowingly and willfully; and that he was not the victim of entrapment.
 

 With respect to the sale-of-stock transaction which is the subject of counts 6 through 9, the jury’s findings were necessarily similar to those on counts 2 through 5 pertaining to the stock-and-loan transaction, except that the “thing of value” and “compensation” received by Williams was the promise of a second group of Arab businessmen to purchase the venture outright, and the corrupt conduct of defendant Williams consisted of a repetition to the new group of the same promise,
 
 i.e.,
 
 that he would use his influence to obtain government contracts for the titanium. The interstate travel occurred on September 11, 1979 when defendants Williams and Feinberg and others travelled to Kennedy Airport to meet with Amoroso, Weinberg and others to discuss the sale of the stock.
 

 In the substantive counts, 2 through 4 and 6 through 8, defendant Feinberg is charged as an aider and abettor, and the jury’s verdicts determined not only that defendant Williams was guilty of the underlying crimes, but also that defendant Feinberg willfully joined in and assisted defendant Williams in committing each of those crimes. The jury also determined that defendant Feinberg was not the victim
 
 *1087
 
 of entrapment on any of the substantive counts.
 

 Feinberg was also charged as an aider and abettor in count 5; here, the evidence before the jury does not support a guilty verdict.
 
 See
 
 section VI,
 
 infra.
 
 In count 9 Feinberg is charged directly with a Travel Act violation for his travel to Kennedy Airport on September 11, and the evidence supports the jury’s verdict of guilty on this count.
 

 On the conspiracy count, 18 U.S.C. § 371, the jury necessarily found that there was a conspiracy of the type charged in the indictment, that both of the defendants willfully became members of the conspiracy, that specified overt acts were committed during their membership in the conspiracy, and that defendants were not the victims of entrapment.
 

 IV. DEFENDANTS’ ARGUMENTS
 

 On these motions defendants incorporate all of the arguments urged in the
 
 Myers, Lederer
 
 and
 
 Thompson
 
 cases, and advance additional specific arguments in support of their own unique due process contentions. Defendant Williams argues that he was entrapped by the government agents, who through extraordinary lures and pressures induced him to commit the offenses charged; that evidence of his predisposition is lacking as a matter of law; that as a matter of statutory construction Congress did not intend for these defendants’ actions to constitute a crime; that considered as a whole the government’s conduct was so outrageous as to require dismissal of the indictment; that the court’s charge effectively prevented the jury from considering the entrapment issue; that the audio tapes and videotapes forming the background for the government’s case were erroneously admitted into evidence; and that defendant Williams was the victim of selective prosecution by the government. Williams has also filed a separate brief in support of motions for judgment of acquittal or a new trial wherein he asserts that prosecutorial misconduct and erroneous introduction of similar act evidence warrant the relief requested.
 

 Defendant Feinberg’s main argument is that as a matter of law on the evidence adduced at trial the government failed to prove Feinberg’s predisposition to commit a crime. Feinberg’s contention, which was vigorously pressed at trial to both the court and the jury, is that the government’s inducements were so overwhelming that it is impossible for the government to prove beyond a reasonable doubt Feinberg’s predisposition. Feinberg also urges that the similar act evidence concerning the Ritz casino transaction was erroneously admitted at trial and was so prejudicial as to deprive him of a fair trial. Finally, Feinberg contends that the trial record lacks any evidence to support his conviction of the Travel Act’s violation charged in count 5.
 

 V. MOTION TO SUPPRESS TAPES
 

 Defendants urge that all of the tapes of the voices of defendant Williams and defendant Feinberg should have been excluded from evidence because under the circumstances here they constituted an unreasonable search and seizure. The government’s first response is that defendants have not preserved their fourth amendment claims by filing an appropriate pretrial motion. The government is correct to the extent that defendant Williams’ pretrial motion to suppress all tape recordings involving Weinberg relied on the court’s general supervisory powers rather than on any claimed fourth amendment violation. F.R.Cr.P. 12(b)(3) requires that any motion to suppress evidence be made before trial; F.R. Cr.P. 12(f) provides that the failure to make such a motion constitutes waiver.
 

 Recognizing the limitations on the timeliness of suppression motions imposed by Rule 12, defendant Williams contends that cause has been shown for relief from the waiver, F.R.Cr.P. 12(f), and that because he is making a novel fourth amendment claim the normal rule should not apply. Along these same lines defendant Williams asserts that the magnitude of the surreptitious taping directly affects defendants’ due process rights, an area expressly reserved for post-trial resolution.
 

 
 *1088
 
 To the extent Williams’ argument is based on fourth amendment grounds, the court agrees with the government that the failure to file a pretrial motion constitutes a waiver. To the extent Williams’ current motion relies on “due process” considerations, it is lacking in merit.
 

 While he grudgingly acknowledges that consensual recordings have, as a matter of precedent, escaped the exclusionary rule,
 
 U. S. v. White,
 
 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1970), the new counsel for defendant Williams argues that when so many tapes are used, the cumulative effect becomes unreasonable and, therefore, unconstitutional.
 

 A cynic might characterize defendants’ argument as urging that while a little “truth” is permissible, large quantities of “truth” are unconstitutional. For present purposes, however, it is sufficient to comment that there is no authority for the novel contention advanced by new counsel for defendant Williams, and this court concludes that the argument is as wanting in logic as it is unsound in principle. As pointed out in the
 
 Myers
 
 decision, the quality of evidence produced by tape recordings, particularly by the videotapes in the Abscam cases, far exceeds the sketchy, imperfect evidence available in the usual trial based upon witnesses’ unaided recollections. The motion to suppress the tapes on the ground that there- were too many of them is, therefore, denied.
 

 VI. INSUFFICIENCY OF EVIDENCE TO SUPPORT FEINBERG’S CONVICTION ON COUNT 5
 

 Defendant Feinberg contends that the record is “completely barren” of any evidence to support his conviction for aiding and abetting defendant Williams’ travel to JFK International Airport on August 5, 1979, where Williams met with Amoroso and Weinberg and accepted shares of stock from them. Gov’t ex. 21A. Feinberg argues that the record shows that only Errichetti and Sandy Williams were involved in arranging the meeting at the airport between defendant Williams and the government agents.
 

 In support of the verdict the government points only to defendant Williams’ testimony concerning conversations he had with defendant Feinberg about transfer of the shares of stock. After reviewing the evidence in the case and particularly the portions of the transcript relied upon by the government, the court concludes that the evidence supporting Feinberg’s knowledge of defendant Williams’ travel in interstate commerce to further the illegal transaction is ambiguous at best. While the record does indicate that discussions about transferring the stock took place between Williams and Feinberg, there is no evidence that Feinberg had any hand in arranging either the meeting at Kennedy Airport that eventually occurred or the interstate travel that led to the meeting. Tr. at 4641-42.
 

 Defendant Feinberg’s motion on count 5 for judgment of acquittal pursuant to F.R. Cr.P. 29(c) is therefore granted.
 

 VII. CLAIMED ENTRAPMENT
 

 Defendant Williams advances several arguments relating to the entrapment defense. To the extent that it asserts that the government agents’ conduct toward defendant Williams was improper, the argument goes to the issue of “outrageousness” which is discussed in section VIII of this decision. To the extent that these arguments focus upon the philosophical nature of entrapment and its general relationship to the problems of governmental misconduct, they were reviewed and decided in the
 
 Myers
 
 decision. No new arguments in this area are advanced by defendant Williams, and his rehash of the general issue has not persuaded this court to change its view of the present state of the law relating to “objective entrapment” as expressed in
 
 Myers.
 

 Two arguments are advanced, however, that deal with specific entrapment issues in this case.' Defendant Williams argues, first, that the court’s instructions to the jury on the issue of entrapment were erroneous, and second, that the evidence was insufficient for the jury to find he was predisposed to commit the crimes charged.
 

 
 *1089
 
 The first argument, relating to the jury instructions, contends that the court took the issue of predisposition away from the jury. This argument seizes upon on^ sentence in an unrelated section of the charge, presents it out of context, and concludes that the predisposition question was withdrawn from the jury.
 

 Such a strained construction of the charge not only ignores the overall structure of the charge, but also ignores the specific issues that were given to the jury in the form of the essential elements of the crime. On each count of the indictment the jury was instructed that in order to find the defendant guilty they would have to determine that the government had established beyond a reasonable doubt that the defendant was not the victim of entrapment. As explained to the jury, entrapment is made up of two parts, inducement by government agents to commit the offense, and no predisposition by the defendant.
 

 The jury was further instructed that “the term entrapment means that law enforcement officials, acting either directly or through an agent such as Melvin Weinberg here, induced or persuaded an otherwise unwilling person to commit an unlawful act.” Tr. at 5572. The court next pointed out some of the inducements presented by the government to defendants and turned the jury’s attention specifically to the question of predisposition. Specifically, the court stated:
 

 Under the law of entrapment, therefore, that leaves for you, the jury, to determine as the decisive question on this entrapment issue whether the defendant was predisposed to commit the crime; that is, whether he was ready and willing to commit a crime such as charged here whenever a favorable opportunity was offered. Tr. at 5574.
 

 The court then reviewed several of the conceptual and evidentiary problems that the jury would have to consider in determining whether or not a defendant was predisposed. That review covers approximately 5V2 pages in the record. Tr. 5574-5579.
 

 Later, after completing its discussion of the essential elements of the nine counts of the indictment and after a review of certain specific evidence problems, the court turned to a general wind-up intended to place matters in an overall perspective. The first three paragraphs of that discussion read:
 

 It is important,, ladies and gentlemen, that you focus on the precise issues before you. As I said at the beginning, the defendants are on trial in this case for the specific counts of this indictment. One count of conspiracy, two counts each of bribery, criminal gratuity, conflict of interest and interstate travel for wrongful purposes.
 

 What the FBI agents and Mr. Weinberg did should concern you only to the extent that you find that it affected the conduct and state of mind of a defendant or other participants in the conspiracy or only insofar as it may affect the credibility of any witness with respect to the matters before you.
 

 You are not to be concerned with whether the prosecution of the FBI agents or Mr. Weinberg acted legally or illegally, properly or improperly or whether the Abscam investigation itself was conducted properly. Those are questions which must be decided bv me at an appropriate time, but except in assessing credibility here, not questions which should affect your determination of the facts in this case or the guilt or innocence of these defendants, your central focus must be upon what the defendants did and what they thought.
 

 Defendant Williams contends that the underscored portion of the above passage in effect took the predisposition question away from the jury and emasculated his predisposition defense. Both in its immediate context and in the overall context of this lengthy charge, it appears to this court to be unrealistic for defendant to suggest that the jury could in any way have inferred from the underscored language a direction either that they were not to consider defendants’ predisposition or that they were to automatically conclude that the entrap
 
 *1090
 
 ment element of each offense had been negated beyond a reasonable doubt. Defendant Williams’ motion on this ground is therefore denied.
 

 The second question on predisposition raised by defendant Williams is whether there was sufficient evidence from which a jury could reasonably find predisposition. In substance, defendant Williams argues that the record establishes that he was not predisposed to criminal conduct of any sort, and that it is unquestionably true that when his name came up in the Abscam investigation the government had no reason to suspect him of criminal conduct.
 

 However, at the very beginning when Errichetti approached Weinberg about a possible loan for a business venture in which defendant Williams was interested, considerable doubt was cast upon Williams’ position. As early as March, 1979 there had been presented to the Abscam investigators, at defendant Williams’ initiative, a proposed business venture whose principals included a businessman with a known criminal background (Katz), a grossly corrupt local politician (Errichetti), a lawyer (Feinberg) who was advertised by one of his own co-venturers as a “bag man” and who showed he was willing, if not anxious, to pay and receive bribes, provided they were called “fees”. All three of them were enthusiastically pushing a titanium mine in which a United States Senator (Williams) had a hidden interest.
 

 In its brief the government reviews in some detail the extensive evidence at trial from which the jury could properly find predisposition. While the court does not agree with the government’s characterization of that evidence as “overwhelming”, it does view the evidence as sufficient to support the jury’s findings beyond a reasonable doubt that both defendants were predisposed.
 

 Considering that evidence in the light most favorable to the government, and resolving credibility issues in favor of the government and against the defendant, as required by the applicable precedents,
 
 e.g., Glasser v. U. S.,
 
 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the jury could have found that for an extended period of time defendants Williams and Feinberg had used Williams’ influence and position in attempts to enrich themselves; that, specifically, this was done in connection with the Biocel and Ritz projects; that Feinberg was Williams’ “bag man”;
 
 [10]
 
 that on May 31, 1979 when first asked if he would seek government contracts for titanium, Williams said that he would “try”; that later, at least twice, he specifically agreed to use his influence to obtain government contracts for the titanium; that Williams was willing to receive cash in “expense money” as long as it did not pass to him directly; and that together Williams and Feinberg sought to conceal Williams’ involvement in the titanium mine by use of a “blind trust”.
 

 Defendant Williams also urges that the “pre” in “predisposition” requires as a matter of law that a defendant’s inclination to commit a crime must exist before he has any contact with government agents. This argument can be viewed on two levels. As part of the “outrageousness” argument, it urges that before any investigation may begin,-the government must have evidence that its eventual target was predisposed to commit a crime. This argument is discussed in the “outrageousness” section.
 
 [11]
 

 On a different level, defendants’ argument could be viewed as requiring that the jury, when it determines “predisposition”, focus not upon the time when the crime was committed, but upon the time when the government’s investigation began. On a conceptual level, the court rejects this argument. The relevant time for determining predisposition cannot be so precisely focused. Evidence of everything that happened before final completion of the crime was relevant, but ultimately, it was for the jury to determine under the instructions given here whether the defendants were predisposed, that is, whether they were oth
 
 *1091
 
 erwise innocent persons who were enticed, induced, persuaded, or lured to commit the crime, or whether they were ready and willing to commit such a crime whenever a favorable opportunity was offered. The jury found that the agents did not induce an innocent person, but did no more than furnish a convenient opening for criminal activity in which defendant Williams and defendant Feinberg were prepared to engage.
 

 Defendant Williams comments that in the
 
 Myers
 
 decision this court seems to have “written off” the predisposition concept as a matter of law. This argument reflects misunderstanding of the issues in
 
 Myers.
 
 That decision dealt with seven defendants in three cases. Except for some due process overtones, entrapment was not raised by the four defendants in
 
 Myers
 
 nor by the two defendants in
 
 Murphy.
 
 In those cases there was no request to charge on the issue, and the government did not present evidence on the issue.
 

 Only with Congressman Lederer were entrapment and predisposition made issues for the jury’s determination. With Lederer, there was very little evidence of the defendant’s earlier activities. The jury was asked to determine predisposition largely from evidence showing Lederer’s knowledge of the purpose of the meeting and his response to the bribe when it was offered. The instruction on entrapment given there was similar to the one presented to the jury here; it focused primarily on the predisposition question, and it asked the jury to determine from all the circumstances whether or not Congressman Lederer was predisposed to accept the proffered bribe.
 

 Consequently, while predisposition was not a major concern in the
 
 Myers
 
 due process decision, this court by no means “wrote it off” as a potentially significant legal issue under proper circumstances. Such proper circumstances were certainly present as to defendants Williams and Feinberg here, and on substantial evidence the jury determined the issue against them.
 

 VIII. CLAIMED OUTRAGEOUSNESS
 

 Defendants contend that numerous incidents of governmental misconduct, either singly or in combination, place this case at the “demonstrable level of outrageousness” that the Supreme Court has suggested might warrant dismissal of charges even where proof of a defendant’s predisposition to commit a crime defeated his claim of entrapment.
 
 Hampton v. U. S.,
 
 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). The instances of misconduct relied upon are discussed below.
 

 A.
 
 The “Coaching” Incident.
 

 Much ado is made about the so-called “coaching” episode on June 28, 1979, where Weinberg is said by defendants to have put words in defendant Williams’ mouth and thereby prevented him from speaking his own mind at the meeting with the sheik that followed immediately thereafter. In that taped conversation, Weinberg told Williams that the sheik was interested in hearing how “high” Williams was in the Senate, Gov’t ex. 14A at 2; whom Williams knew who could do favors for the business venture,
 
 id.;
 
 and how Williams would use his influence and importance to obtain government contracts,
 
 id.
 
 at 3-4. Weinberg also told Williams that his conversation with the sheik would be “all talk, all bullshit”,
 
 id.
 
 at 5, that he just had to “play, blow his horn, and mention names”,
 
 id.
 
 at 6, and that Williams would merely be “on stage for twenty minutes”,
 
 id.
 
 at 7.
 

 The videotape of Williams’ meeting with the sheik includes statements by the senator of his importance within the senate and his influence with the president, as well as with numerous other governmental officials. Gov’t ex. 15A at 7-8. When asked by Amoroso whether he would be able to secure government contracts if the sheik agreed to finance the mining venture, Williams replied, “no problem, * * * it will come to pass.”
 
 Id.
 
 at 9. To the jury the government argued that this tape demonstrated defendant Williams’ complete and willing commitment to using his position corruptly to secure government contracts for the titanium venture.
 

 
 *1092
 
 Although Williams now asserts through new counsel that Weinberg and Errichetti had placed upon him extraordinary pressures that induced him to make certain uncharacteristic, if not involuntary, statements and to acquiesce by his silence in statements made by others, Williams’ own trial testimony simply does not support his new attorney’s argument. At trial Williams’ own attorney exhaustively questioned him about the effect of Weinberg’s suggestions and comments. Tr. at 4297-4389. When asked by his attorney on his direct examination to explain his reaction to Weinberg’s statements, Williams explained that “it was offensive but it didn’t mean a great deal to me to tell you the truth.” Tr. at 4299. This statement was a consistent theme of Williams’ testimony concerning the “coaching” incident:
 

 He [Weinberg] wanted me to talk about my importance. That’s what he wanted.
 
 And I just thought I would go up there and talk about what I thought was important,
 
 and that’s what it was all about basically, this enterprise of mine in Virginia; Tr. at 4306 (emphasis added). ******
 

 Q. Senator, now Weinberg is saying to you clearly, government contracts, using your influence. And all you are saying here is um-hum, gotcha, um-hum, um-hum. What were you thinking when this was going on?
 

 A. What I started to develop a moment ago, while he’s going on this way I was thinking of what I was going to develop when I got upstairs. * * *
 
 but there can be no exaggeration, no statement of things I know I could not do, would not do
 
 in no shape was I going to be associated with, even in a baloney sense as they called for, and that was a contract. Tr. at 4307 (emphasis added).
 

 ******
 

 Q. Did you ever say you are the man, you are going to open the doors, you are the man who is going to do this, to use my influence, and I guarantee this?. A. No.
 

 Q. Did you ever guarantee anything?
 

 A. Absolutely not. Tr. at 4309. ******
 

 And I knew I was not going to say anything about any of that
 
 because it had not — I had not been involved. * * * and
 
 I know I was not going to say anything about it.
 
 Tr. at 4310 (emphasis added). ******
 

 I don’t know. I was thinking about going upstairs.
 
 I didn’t listen intently to every word that Mel was saying,
 
 I’ll tell you.
 

 Q. What about you’re onstage for 20 minutes, the most expensive TV star that ever got paid. What did that mean to you, sir?
 

 A. This meeting — it is an important meeting. And that’s all that I got out of that. Tr. at 4316 (emphasis added). ******
 

 It — I think I said yesterday,
 
 this is not for me, what he’s talking about,
 
 that kind of effort to impress the Sheik.
 
 I was going to do it my way. So, I didn’t really concentrate on that which was meaningless to me.
 
 I knew what the purpose of the meeting was to try to impress the Sheik. Tr. at 4328-29 (emphasis added).
 

 Williams also testified that contrary to Weinberg’s and Errichetti’s instructions, he decided to discuss the mine with the sheik:
 

 He [Errichetti] told me not to talk about the mine. I was going to do that—
 

 Q. Did you do that eventually?
 

 A. I certainly did. Tr. at 4329. ******
 

 Q. Why did you begin by talking about the mine which is exactly opposite what Errichetti and Weinberg told you?
 

 A. The only reason this was all coming about, this meeting, as far as I was concerned, was because of the mine. That was our reason for being together. Tr. at 4332.
 

 At trial, Williams’ position was essentially that the videotape did not incriminate him, but the jury obviously rejected his argument. Now, Williams asserts that the
 
 *1093
 
 incriminating statements he made on videotape were the product of coaching; but his sworn testimony unequivocally establishes that his statements and actions on camera were voluntary and intentional. They cannot be dismissed as merely the product of Weinberg’s urgings.
 

 The claim of prejudice from Weinberg’s and Errichetti’s “coaching” is advanced by Williams’ new counsel who appeared in the case to argue the “due process” issues. As already demonstrated, Williams testified at trial that he was not influenced by Weinberg’s statements. At the post-trial due process hearing, Williams did not testify and retract his trial position. What we are left with, then, is simply an attorney’s argument that lacks foundation in the record.
 

 Moreover, Williams could not reasonably complain that he was duped by Weinberg and Errichetti to the point of innocently acquiescing in the proposed illegal bribery. Several times Errichetti and Weinberg had told him that in order to get the loan from the sheik he would have to tell him he had the political connections and power to produce government contracts for the purchase of titanium. There is no way that Williams could have misunderstood what was proposed: an offer of Williams’ “power and influence” to obtain contracts in order to induce the sheik to grant the loan. Williams’ fine educational background, his long political experience, the heights to which he had risen in the councils of government, all argue overwhelmingly against any claim that people such as Errichetti and Weinberg could “put words in his mouth” or make him say things that he did not mean or did not want to say. The court finds that the conduct toward Williams of the government agents and of Weinberg with respect to the June 28, 1979 meetings was not “outrageous”.
 

 The court further finds that despite the prompting and “coaching” by Errichetti and Weinberg before his meeting with the sheik on June 28, 1979, defendant Williams acted voluntarily and intentionally in that meeting and was not influenced to say or do anything that he had not previously agreed to say and do; consequently, Williams was not prejudiced by the conduct of Weinberg and Errichetti. Absent demonstrable prejudice to Williams, dismissal of the indictment is unwarranted.
 
 U. S. v. Morrison,
 
 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981);
 
 U. S. v. Payner,
 
 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980).
 

 B.
 
 Timing of Interruptions.
 

 Williams contends that the government deliberately interrupted his conversation with the sheik on January 15, 1980 when Williams was about to explain why he did not want money in return for immigration help. The January 15 meeting had been arranged by the agents in order to give the sheik an opportunity to discuss with Williams the sheik’s desire to immigrate to the United States. In a scene partially reminiscent of the other Abscam cases, Williams was bluntly offered money in return for his. promise to assist the sheik’s entrance to the United States. Williams, however, rejected the money offer. Gov’t ex. 25A at 8-9. As Williams began to explain the basis for his refusal, Amoroso entered the room and told the sheik that a phone call had arrived for him. Moments later, the phone rang and the sheik excused himself from the room.
 

 Defendants urge that the interruption evidences the government’s determination to prosecute Williams at all costs. The government was so determined, the argument goes, that Amoroso was deliberately sent into the room to prevent Williams from explaining on tape his refusal of the money.
 

 There are several reasons why this argument is without merit. In the first place, the interruption was anticipated long before the talk turned to bribery. The videotape clearly shows that even before the sheik and Williams were left to discuss matters alone, Amoroso told the sheik that he would be interrupting the meeting with an anticipated phone call.
 
 Id.
 
 at 2. Secondly, defendant’s argument assumes that there was to be an interruption only in the event that Williams declined the bribe offer, but
 
 *1094
 
 the assumption is unsupported by any evidence.
 

 Moreover, Agents Amoroso and Good testified at trial that the decision to send Amoroso into the room to interrupt the meeting was made before Williams had refused the offer of money. The testimony of Thomas Puccio at the due process hearing corroborates Amoroso’s and Good’s version, and the court finds their explanation believable. Finally, even if the evidence substantiated defendants’ “intentional interruption” hypothesis, there was no prejudice to Williams because Williams was given the opportunity to refuse the money on videotape, and not only did so, but also explained why.
 
 See Payner
 
 and
 
 Morrison, supra.
 

 The significance of the interruptions was vigorously argued to the jury by defense counsel, who contended that Williams’ refusal of the cash bribe proved his general innocence and his lack of predisposition. The government argued that the videotape confirms Williams’ interest in the mining venture, and his desire to have it succeed.
 

 It is true that the tape clearly shows that Williams rejected an offer of money in return for immigration aid to the sheik. But the tape also shows that the interruption did not disrupt Williams’ explanation of his position, for when the conversation and the tape resumed, Williams immediately picked up the same subject and stated in substance that what he wanted from the sheik was not a cash payment, but the sheik’s financing for the titanium project. Williams said:
 

 No, the er, my interest is with my associates. To, to see this very valuable mining area, er, appropriately developed. It’s doing nothing now. There is the, there is the ore, there’s the titanium. There is the iron. There is the phosphorous. All of them are needed and yet nothing is happening. So'
 
 my only interest is to see this come together.
 
 And the, and the, the elements that I can help with, your,
 
 your personal situation.
 
 Er, I am very,
 
 I find it, er, a desirable thing to do for you, personally. And it’s part of creating something of value, bringing in that ore.
 
 Gov’t ex. 25A at 9 (emphasis added).
 

 C.
 
 Internal Governmental Memorandum.
 

 Defendants argue that because an internal FBI memorandum of November 27, 1979 suggested that the case against Williams was then incomplete,
 
 [12]
 
 and because Williams thereafter refused to accept a cash bribe on January 15, 1980, the government itself has already conceded that Williams did not commit any crime and that the indictment, therefore, should be dismissed. Merely because some government employees were not overly impressed with the strength of the Williams case as of November 27, 1979, does not mean that the government was precluded from testing the sufficiency of its evidence before the grand jury in obtaining an indictment, or from convincing a petit jury of defendants’ guilt beyond a reasonable doubt. For the government to be bound by internal preliminary evaluations of the strengths and weaknesses of a particular case would discourage prosecutors from ever acknowledging that a particular facet of a case was potentially weak or needed further evidence or might require careful handling at trial. Rather than discouraging careful preindictment evaluation of a case, however, the governing rules should encourage a prosecutor to thoroughly and vigorously evaluate all of the available evidence not only to prevent unnecessary trials but also to ascertain and strengthen potential weak spots which might later permit a guilty suspect to avoid conviction.
 

 The court concludes that the existence of the November 27, 1979 memorandum suggesting that further specific proof be adduced of Williams’ criminal propensity before seeking an indictment against him does not preclude the government from proceed
 
 *1095
 
 ing even when the additional evidence is not forthcoming.
 

 D.
 
 Selective Prosecution.
 

 Defendant Williams moved pretrial for dismissal of the indictment on the ground that he was the victim of selective prosecution. The court reserved decision on the motion in order to consider it post-trial in light of evidence that would develop at trial and in the post-trial “due process” hearing. Williams now reasserts the motion, although the basis for the contention has shifted somewhat.
 

 Originally, Williams contended that he and other Abscam defendants had been singled out for prosecution because they had supported Edward Kennedy for the Democratic nomination for president rather than the then incumbent, Jimmy Carter. Now, by letter to the court dated October 23, 1981, Williams’ attorneys state that the claim is
 

 not so much that Kennedy supporters were targeted but rather that certain people were given the honesty test and others, who may have been targeted by lower level government agents, were not so tested either as a result of orders from superiors or tipoffs to them as to the scam. It appears that to a large degree those people were supporters of then President Carter.
 

 Williams contends that he is now entitled to still a further hearing on the issue. Evidence has already been presented on this question, both in the original motion papers, which included some of the testimony of Brewer before the Senate Judiciary Committee, and by witnesses at the due process hearings. On the basis of that evidence the court finds that Williams was not singled out for prosecution, nor was he “negatively selected” through the failure of some justice department official to tip him off that he was under investigation. If such a leak occurred with respect to some other potential targets, as intimated by Brewer’s testimony, that leak did not reflect justice department policy, but instead was the result of misconduct by some individual in the department.
 

 The court further finds that there were no orders from superiors directing the investigators to focus upon particular individuals, nor were there any orders forbidding them from pursuing any leads that the investigation opened up. The court further concludes that Williams was not the victim of selective prosecution; on the contrary, his prosecution was the natural outgrowth of his initial joining with Errichetti to seek financing for the titanium mine from the undercover operatives.
 

 Defendant Williams has brought no additional information to the court’s attention which would warrant still more hearings under the principles described in
 
 U. S. v. Berrios,
 
 501 F.2d 1207 (CA2 1974), nor is there any claim of evidence that was newly discovered since the due process hearing in June, 1981. Consequently, defendant Williams’ motion for a further hearing on this question is denied.
 

 E.
 
 Amount of Inducement.
 

 Both defendants, but Feinberg in particular, urge that the amount of the inducement offered to defendants was so great as to constitute entrapment as a matter of law and “outrageousness”. In the stock-and-loan transaction the inducement was not an outright payment to the Williams group, but instead was a loan that was sufficient to fund the purchase and initial operation of the titanium mine and processing plant. Interest was required to be at the prime rate, and the loan was expected to be repaid. If the inducement was excessive to the defendants, it could have been only because they realized that the financial potential of the mine and plant did not justify such a loan. Since no personal guarantees were asked for, this would mean that more money was to be advanced to defendants than they ever expected to repay. Such a fraudulent intent the court does not find.
 

 On the contrary, the court agrees with defendants that they viewed the mine and processing plant as legitimate business ac
 
 *1096
 
 quisitions.
 
 [13]
 
 Considering the extent of the real estate to be acquired, the apparent value of the ore deposits, and the production potential of the processing plant, it cannot be said that as a matter of law the amount of the offered loan, the inducement, was outrageous, excessive, or unreasonable.
 

 On the sale-of-stock transaction it was proposed that the Williams group “roll over” their investment in the mine and processing plant by selling the package to a different Arab businessman for the price of $170 million. Out of that, of course, the initial $100 million to be advanced by the first sheik would have to be repaid. The apparent profit before taxes to defendants Williams and Feinberg would have been approximately $10 million each. Unquestionably, that is a substantial sum of money. In this court’s view, however, for people such as defendants Williams and Feinberg who live and work in the top echelons of our society, the sum is not so excessive as to exonerate them from criminal responsibility in accepting the bribe.
 

 F.
 
 Miscellaneous Instances of “Outra
 
 geous”
 
 Conduct.
 

 Other instances of “outrageous” governmental conduct' urged by defendants include Errichetti’s forgery of defendant Williams’ signature to a letter, Weinberg’s alleged forgery of certificates of deposit that he provided to William Rosenberg, the FBI’s agreement with the Chase Manhattan Bank for the bank to tell anyone who inquired that the sheik had a substantial deposit, and the use of an informant such as Melvin Weinberg in any investigation. The government’s use of Weinberg, the Rosenberg certificates of deposit, and the Errichetti forgery have been fully discussed in the
 
 Myers
 
 opinion.
 
 Myers
 
 opinion 527 F. Supp. at 1235, 1240-1242. They need not be reviewed again, and they do not form a basis for dismissal of this indictment. Nor does the Chase Manhattan Bank’s “gross deception”, Williams memorandum at 46, affect the due process rights of these defendants, who do not even claim that they had direct knowledge that the sheik’s funds were on deposit until after knowledge of the Abscam investigation became -public.
 

 G.
 
 Cumulative Effect.
 

 Defendants have argued not only individual instances of claimed outrageous conduct by the government, but they also urge that, when combined, the various instances have a cumulative effect which amounts to outrageousness. The court is not convinced. As indicated above, many of defendants’ arguments are not factually supported by the record; other instances that did occur did not prejudice any rights of the defendants. Whether viewed as separate instances or in its totality, the conduct by the government during its investigation does not constitute outrageousness that would require dismissal of the indictment under applicable Supreme Court precedents.
 
 [14]
 

 IX. CLAIMED MISCONDUCT BY GOVERNMENT AT TRIAL
 

 Defendants urge several points designed to show that the government engaged in persistent misconduct during the course of the trial.
 
 [15]
 
 They urge that the government
 
 *1097
 
 improperly introduced evidence of the activities of defendant Williams with respect to the Ritz Casino and a permit for the Bioeel Corporation; they argue that the government intentionally misrepresented at trial the purpose for introducing a second group of Arab businessmen to purchase the titanium venture; they object to the prosecutor’s references to defendant Feinberg as defendant Williams’ “bag man”; and they criticize certain comments made during the government’s summations.
 

 A.
 
 Ritz Casino Evidence.
 

 Defendants argue that evidence of their involvement in obtaining a permit for the Ritz Casino was improperly offered for two reasons. In the first place, they contend that the evidence could not show
 
 pre
 
 disposition since it occurred in 1979,
 
 after
 
 the investigation had begun. Assuming that the titanium mine and Ritz Casino projects proceeded simultaneously, nothing in the law of entrapment would preclude at the titanium trial evidence of defendant Williams’ other attempts to use influence on public officials, whether made before, during or after the titanium events. Logically, such evidence is relevant to Williams’ state of mind; absent a claim that somehow the Abscam investigators also induced defendant Williams’ overtures to members of New Jersey’s Casino Control Commission, a claim not made here, such conduct is legally admissible to show defendants’ motive, opportunity, intent, preparation, and method' of operation. F.R.E. 404(b).
 

 Secondly, defendants argue that it was improper for the government to use evidence of Williams’ activities with Lordi, because the government had in its files memoranda acknowledging that the officials in New Jersey had been unable to corroborate or confirm the investigative lead. This argument conveniently overlooks, however, the source of the evidence that Williams and Feinberg attempted to influence a decision by the Casino Commission. That evidence was a taped conversation in which Williams and Feinberg told of, indeed, bragged of their contacts with commission members and of the results which had followed. Gov’t ex. 24A. It may be that the commission members that were claimed to have been approached, do actually deny that the events occurred. It may also be that in a prosecution against the commissioners there would be insufficient evidence to establish guilt. The government’s evidence here, however, consisted of direct admissions by Williams and Feinberg, admissions made under circumstances that were designed to impress the listeners with their know-how, their awareness of political reality, their ability to achieve results, and their willingness to use the Senator’s influence for financial gain. In such circumstances there is no unfairness in using the defendants’ own voluntary statements as evidence against them.
 

 In one of their memoranda, Plaza and Weir analyzed the evidence about Williams’ participation in the Ritz Casino application. DP ex. 24. At page 9 they conclude: “there is no evidence that Williams made such inquiry or recommendation to Lordi.” Of course, Plaza and Weir did not have the benefit of Williams’ trial testimony that he “thought” he had contacted Lordi on the subject; but in concluding that there was “no evidence”, they do seem to have disregarded that Williams and Feinberg jointly made the videotaped admissions.
 

 Evidence of the Ritz Casino activities was relevant on the issue of defendants’ predisposition at the trial. In a conference whose record was sealed, the court explained its evaluation of the arguments under F.R.E. 403 and 404(b); t-here is no need to repeat that evaluation here. In sum, however, defendants did not establish that the relatively high probative value of the evidence was substantially outweighed by the danger of unfair prejudice.
 

 B.
 
 Biocel Evidence.
 

 In a similar vein, although of less dramatic impact, was evidence about defendant Williams’ attempting to use influ
 
 *1098
 
 ence with certain local officials in connection with obtaining a permit by the Biocel Corporation in' which defendant Williams had an undisclosed interest. Since those transactions were not tape recorded there were sharp questions of credibility over this issue. Assuming the government’s evidence to have been true, however, the legal analysis here is similar to that with respect to the Ritz Casino, and under the balancing test required by FRE 403, the evidence was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice.
 

 Defendants also argue that the government failed to fulfill its obligations under
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in connection with the Ritz Casino and Biocel matters. The flaw in this argument, however, is that defendants were already aware of any material that would have been admissible in evidence. The argument is directed to prosecution memoranda and claims that investigations by other governmental agencies failed to produce indictments in those matters. Evidence of the prosecutors’ opinions is not admissible, nor would be memoranda embodying those opinions. The witnesses who were involved in the activities were known equally to both sides. Since the government’s claim with respect to the two transactions was also known to defendants, the witnesses who could have testified on the issues were equally available. In fact, defendant Williams did call some witnesses to testify on the transactions. Consequently, the argument based on
 
 Brady
 
 is rejected-
 

 C.
 
 The Purpose For the Resale “Stall”.
 

 Pointing to the government’s opening statement, defendant Williams claims the prosecution invented a story of a “fictitious stall” to explain why the investigation of defendant Williams continued after he took the stock certificates on August 5, 1979. The undercover operators had promised a loan of $100 million, which, of course, they did not intend to produce. According to the government, the Abscam investigation was continuing in other areas and, therefore, could not then be terminated.
 

 Defendant argues that the government presented no evidence to support the claim made in its opening statement; that the reason for the “stall” was false; that the true reason was because the government’s case against Williams was insufficient; and that there was no good faith basis for the government’s opening statement.
 

 If the government failed to present evidence on an essential aspect of the case, this could have been grounds for dismissal of a charge, and it certainly was fair argument to the jury about the strength of the government’s case. For defendant to suggest, however, that there was no good faith basis for the government’s opening statement, is frivolous.
 

 The sequence of the events undercuts defendants’ argument. At about the same time that defendant Williams accepted the stock, in August, 1979, the Abscam investigators began a series of bribe transactions with congressmen that continued up into January of 1980. In order to complete those transactions the agents had to keep “Abscam” undercover. Moreover, the resale of the titanium project was first suggested to defendants in September of 1979, some two months before the November 19th meeting when, defendants argue, the need for a “stall” arose.
 

 Both in this context and others, defendants misplace their reliance upon the internal FBI memorandum of November 27, 1979, which summarized the meeting of November 19. After reviewing the status of the Abscam investigation, certain conclusions and recommendations were reached by the relatively large group that had been assembled for the purpose. Among that group were those from New Jersey who insisted that there was no case at all against Senator Williams.
 

 The recorded conclusion of the meeting was that it was “necessary to re-contact U.S. Senator Williams” for two purposes: to obtain a commitment that he would sponsor legislation relating to the titanium
 
 *1099
 
 mine, and to confirm that Williams wanted his shares hidden. The memo concludes that “if” such information was obtained “prosecutors at the meeting” felt that they could prove Williams guilty of bribery and conspiracy. The court does not construe the word “necessary” and the conditional “if” to be binding limitations upon the government’s ability to act upon information that was already in its possession, or upon other, additional information they might discover. The meeting must be viewed in the context of a sharp division within the justice department, not only between the Brooklyn and New Jersey prosecutors, but also with respect to the claims by the Philadelphia prosecutor that he should be given an opportunity to develop an Abscam case there.
 

 Clearly, the Brooklyn prosecutors did not feel that the recontact was “necessary”, even though they may have viewed it as a desirable means of strengthening their case. Clearly, too, those with veto authority over the prosecutions did not view the conditional “if” in the memorandum to be a binding limitation that would prevent prosecution unless the designated information was obtained, because the information was not obtained and those same people ultimately approved the prosecution anyway.
 

 A more balanced view of the November 19th meeting and its ensuing November 27th summarizing memorandum is that the wording of the memorandum was designed to confirm agreement upon some future action with respect to defendant Williams that would be taken, without imposing limitations either upon the investigation or upon the eventual prosecution.
 

 At bottom, defendants’ argument contends that unless everyone on the government’s side agrees that the available evidence makes out a case, a subsequent indictment and conviction based on that evidence violates some right of the defendant. Such has never been the law. Prosecutors frequently disagree with each other about the weight and sufficiency of evidence, just as they do with defense attorneys and, on occasion, with judges.
 

 Nor can it seriously be argued, as do defendants and others, that the internal disputes of the justice department were proper evidence for the jury’s consideration. Such discussions and their related memoranda constitute protected work product because they reflect counsel’s analysis and opinions concerning the case. Some of those disputes have subsequently been disclosed in these and other due process hearings. Such disclosures were permitted in order to plumb the utmost depths of defendants’ claims. However, those opinions and the memoranda embodying them were not relevant to any of the specific issues the jury was called upon to decide in this case.
 

 In short, neither the document nor testimony about the meeting was admissible at the trial, because opinions of government counsel about the strength or weakness of their case are irrelevant to the jury’s determination of guilt and innocence. The rule could not properly be otherwise. Indeed, if the prosecutor’s opinion that he had a weak case was admissible for jury consideration, in fairness so also should be his opinion that he has a strong case. Clearly, such considerations are improper as evidence for jury evaluation. When expressed in summations they are unprofessional and, possibly, grounds for reversal. Worst of all, if admitted into evidence, such opinions would not only make witnesses out of prosecutors,
 
 [16]
 
 but they would distract the jury from their essential role in the criminal process: determining guilt or innocence based upon the evidence.
 

 D.. Feinberg as
 
 “Bag Man
 

 Defendants vigorously protest the government’s characterization of Feinberg as defendant Williams’ “bag man”. Defendant Williams’ complaint about use of the term is focused upon the government’s brief on the post-trial due process hearing. Defendant Feinberg complained about use of the term in the government’s summation.
 

 
 *1100
 
 Codefendant and co-conspirator Errichetti originally tacked the label on Feinberg in a recorded conversation with Amoroso and Weinberg on March 24, 1979. Gov’t ex. 3A. When the characterization first came up at the trial it was in the context of testimony by a government witness that Errichetti had referred to Feinberg as Williams’ “bag man”. Defendants’ objection to the characterization was sustained, and the jury was told to disregard it. The reasons for the ruling were that Errichetti’s opinion was of little probative value, his credibility was seriously suspect, and there seemed to be no need to add to what was already in evidence on the tape.
 

 No further mention of “bag man” occurred until as the first question on Feinberg’s direct examination, his attorney asked
 

 Mr. Feinberg, are you now, or have you ever been Senator Williams’ bagman? Tr. 3540.
 

 Feinberg, of course, denied the characterization. On cross-examination, the government’s attorney explored Feinberg’s understanding as to what a “bag man” is, and as to the relationship between an influential politician and his bag man. Essentially, Feinberg testified that the term has corrupt connotations, that a bag man is someone who would accept money on behalf of a public official and funnel that money to him, and that a bag man basically is someone who is out front for a public official, who saves the public official from certain contacts and exposure. Tr. 3794-96.
 

 Given Feinberg’s own explanation of the term before the jury and the evidence with respect to the relationship between Feinberg and Williams, coupled with their specific statements and conduct in this case, it was fair argument to the jury that Feinberg fit his own definition of the term and that he was, indeed, Senator Williams’ “bagman”.
 
 A fortiori
 
 the government’s characterization of Feinberg in a post-trial memorandum as the “bag man” for Senator Williams, is not improper.
 

 E.
 
 Summations.
 

 Defendants attack the government’s summations as being improper and unprofessional, and argue that they constitute a basis for a new trial. They rely particularly on the Second Circuit’s recent decision in
 
 U. S. v. Modica,
 
 663 F.2d 1173 (1981).
 

 In light of the arguments presented, the court has reviewed the summations by government counsel and finds no impropriety warranting corrective action.
 
 Modica
 
 underscores the ethical principle that an attorney should not vouch for the credibility of his own witnesses. However, the line between vigorous argument over credibility and improper “vouching” is not always easy to draw. Moreover, there are practical differences in the impact of an argument in support of one’s own witnesses and an argument that attacks those of the adversary.
 

 Módica
 
 did not intend to stultify effective argument. A variety of sanctions against improper argument are suggested there, but defense counsel in this case sought at trial, and still seek only the most drastic — a mistrial. With one exception, not relevant here, there was no objection to the prosecutor’s remarks when they were made. Only at the conclusion of summation was an objection raised.
 

 The closing arguments of all counsel in this case were spirited, vigorous, robust, and hard-hitting. They focused the issues clearly for the jury. Central to the case were the credibility of defendant Williams, of defendant Feinberg, and of Sandy Williams, the government’s immunized witness. The essence of the government’s case was that the true conduct and intent of defendants Williams and Feinberg could be determined from their statements on the tape recordings. When each of them testified at the trial they attempted to explain what they had said, what they had done, and why they had done it — all in non-criminal terms. The government contended that both were lying at the trial. The prosecutor pulled no punches; he called a lie, a lie. In attacking Sandy Williams, defendant Williams’ attorney did the same. “Lie” is an ugly word,
 
 *1101
 
 but it is appropriate when it fairly describes the ugly conduct it denotes.
 

 In this court’s judgment, the combined effect of all counsels’ arguments at the end of this long trial was one of sharp conflict over the issues, a painstaking clarification for the jury of the essential points of dispute, and a demonstration of the adversary process functioning at its best. Throughout, the prosecutor’s arguments were supported by the evidence, constituted fair comment on the evidence, and were conducted in a professional, ethical, fair and constitutional manner. Defendants’ motions for a new trial on this ground are denied.
 

 X. CONCLUSION
 

 The central inquiries running through all of the “due process” issues were whether defendants were treated fairly, whether the trial was conducted in accordance with established principles of fairness and constitutionality, and, ultimately, whether the jury’s verdicts of guilty were just. On the entire record it is clear that defendants entered on a course of conduct knowingly and voluntarily, and that before committing the criminal acts charged against them they were aware that corrupt use of Senator Williams’ political influence and power was to be an essential part of the titanium deal. While the anticipated profit was substantial, the inducements offered by the government did not make irrelevant the defendants’ predisposition to commit the crimes. Their predisposition having been found by the jury on evidence that is not only sufficient but convincing, the determinations of guilt are proper.
 

 The court has found no merit in defendants’ arguments of governmental misconduct sufficient to warrant either dismissal of the indictment or a new trial. This applies not only to the arguments specifically discussed in this decision, but a variety of additional arguments raised in the papers submitted, all of which have been considered and found wanting by this court.
 

 Accordingly, defendant Feinberg’s motion for judgment of acquittal on count 5 is granted. All other motions by defendant Feinberg and by defendant Williams are denied. Defendants shall appear for sentencing at the Long Island Courthouse on January 26, 1982 at 1:30 p. m.
 

 SO ORDERED.
 

 [1]
 

 . Defendant Williams made an additional pretrial motion seeking disclosure of any prior electronic surveillance in order to assess whether the government had determined to prosecute Williams because of any information obtained through surveillance activities. The government requested that the results of an “all agency search” be furnished to the court, and the court inspected the documents furnished in response to the search. The court did not disclose the contents of the documents to defense counsel, but assured them that no materials relevant to the instant case had been produced. Defense counsel at one point continued to request access to the materials furnished to the court, which request was denied. The materials were placed under seal and are available for appellate review.
 

 [2]
 

 .
 
 U. S. v. Myers et al.,
 
 527 F.Supp. 1206 (E.D. N.Y.1980).
 

 [3]
 

 .
 
 U. S.
 
 v.
 
 Lederer et al.,
 
 527 F.Supp. 1206 (E.D.N.Y.1980).
 

 [4]
 

 .
 
 U. S.
 
 v.
 
 Thompson et al.,
 
 527 F.Supp. 1206 (E.D.N.Y.1980).
 

 [5]
 

 . Consolidated memorandum and order denying “due process” and other post-trial motions (July 24, 1981).
 

 [6]
 

 .
 
 U. S. v. Jannotti et al.,
 
 501 F.Supp. 1182 (E.D.Pa.1980);
 
 U. S.
 
 v.
 
 Jenrette et al.,
 
 Docket No. CR 80-00289 (D.D.C.1980);
 
 U. S. v. Kelly et al.,
 
 Docket No. CR 80-00340 (D.D.C.1980).
 

 [7]
 

 . In the
 
 Myers
 
 decision this court set forth its views on many of the issues presented by defendants in this case. Not only is familiarity with that decision assumed, but the rulings therein, insofar as relevant here, are incorporated by reference into this memorandum and order.
 

 [8]
 

 . The court has been informed that Mr. Katz is now deceased.
 

 [9]
 

 . Sandy Williams was a long-time friend of defendant Williams, but was not related to him.
 

 [10]
 

 .
 
 See
 
 discussion in section IX-D.
 

 [11]
 

 .
 
 See
 
 discussion in section VIII-D.
 

 [12]
 

 . That memorandum is annexed as exhibit A to brief in support of motions for judgment of acquittal or new trial, and was marked as an exhibit at the consolidated due process hearing in
 
 Myers.
 
 DP 73 (Headquarters file, doc. 233). Since the prosecutors’ opinions reported therein were irrelevant to the jury’s deliberations, the memorandum was not required to be disclosed to defendant at trial.
 
 See also
 
 discussion in section IX-C.
 

 [13]
 

 . As mentioned above in section II, defendants’ criminal conduct arose out of their willingness to use and promise defendant Williams’ influence and public position as an aid in getting government contracts for the output of an otherwise legitimate mining enterprise.
 

 [14]
 

 . It should be noted that to a significant extent, defendants are really urging the court to adopt an objective view of entrapment, in violation of controlling precedent. This the court has previously refused to do, and still refuses. Defendants Williams and Feinberg urge two specific claims. (1) Was the government’s conduct “outrageous”? and (2) If not, did the government establish beyond a reasonable doubt that defendants were predisposed to commit the crimes? In section VIII the court answers the “outrageousness’’ question in the negative. At trial the jury found predisposition, that negated entrapment, and in section VII of this decision the court finds the evidence supporting the jury’s finding of predisposition to be legally sufficient.
 

 [15]
 

 . These arguments are to be distinguished from defendants’ “outrageousness” argument, discussed in section VIII, which is directed at
 
 *1097
 
 claimed misconduct during the course of the investigation.
 

 [16]
 

 . The Canons of Ethics strongly discourage the trial attorney from being a witness at trial. See ABA Code of Professional Responsibility and Code of Judicial Conduct. DR 5-102.